**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-4536**

───────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

RESHOD JAMAR EVERETT, a/k/a Kool, a/k/a Kool-Aid,

Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge. (5:20-cr-00333-D-1)

───────────────

Argued:  October 31, 2023                    Decided:  January 23, 2024

───────────────

Before DIAZ, Chief Judge, and KING and WYNN, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge King wrote the opinion, in which Chief Judge Diaz and Judge Wynn joined.

───────────────

**ARGUED:**  Paul K. Sun, Jr., ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant.  Javier Alberto Sinha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Kelly Margolis Dagger, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant.  Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Chief, Appellate

Division, Scott A. Lemmon, Assistant United States Attorney, Caroline L. Webb, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

―――――――――

KING, Circuit Judge:

Defendant Reshod Jamar Everett pursues this appeal from his multiple convictions and sentences in 2022 in the Eastern District of North Carolina. Everett was charged with six drug distribution and firearms offenses in an eight-count indictment, arising from his involvement in extended criminal activity relating to drugs and firearms in Cumberland County, North Carolina. In the proceedings below, Everett unsuccessfully moved to suppress evidence seized by the authorities from his Fayetteville residence. In rejecting Everett's suppression effort, the district court ruled that the authorities satisfied the "protective sweep" exception to the search warrant mandate of the Fourth Amendment. After a four-day trial in May 2022, the jury convicted Everett on each of the alleged offenses. In August 2022, the court sentenced Everett to 480 months in prison, plus supervised release. Everett appeals from that judgment, challenging the court's denial of his suppression motion, the sufficiency of the evidence supporting three of his convictions, and his 480-month prison sentence. As explained herein, we reject each of the appellate contentions and affirm.

I.

A.

Sometime in 2016, Everett got involved in major drug trafficking operations in and about Fayetteville, North Carolina. Everett was known to sell "practically . . . anything," including marijuana, cocaine, and a controlled substance called "THC wax." *See* J.A.

3

669.[1] Two of the participants and coconspirators in Everett's criminal enterprise were men named Godfrey and Murray, who apparently first met Everett in late 2016. Everett mostly sold marijuana to Godfrey and Murray, but also distributed cocaine to Murray and THC wax to Godfrey. Those transactions were not at all trivial. When Murray first began to buy drugs from Everett in about December 2016, Murray would purchase around two pounds of marijuana per day. By July 2017, Murray had increased his buys from Everett to about 40 pounds a week. Godfrey purchased one to two pounds of marijuana per day from Everett from late 2016 until March of 2018.

By August of 2017, Everett and Murray were renting an apartment together in a complex called "the Legacy." They used the Legacy as their storage and distribution center — a "stash house" — for selling drugs. Everett would secure and deliver approximately 100 pounds of marijuana per week to the Legacy apartment. About 50 pounds of that marijuana was for Everett to distribute each week, and the remaining 50 pounds was for Murray to distribute. This formula carried on until about March of 2018.

During the foregoing time period, the Fayetteville Police Department (the "FPD") began investigating Everett's drug trafficking organization and its activities. When the FPD arrested a drug dealer, it would try to climb the ladder of the drug organization. The Everett investigation began in earnest in March 2018, when the FPD officers searched the

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal. The facts herein are recited in the light most favorable to the Government, as the prevailing party in the jury and suppression proceedings. *See United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996) (regarding jury verdict); *United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004) (regarding suppression hearing).

Medway Court residence of Godfrey and Murray in Fayetteville — a location separate from the Legacy. During that search, the officers found and seized about 275 pounds of marijuana packed in vacuum-sealed bags, more than $22,000 in cash, prescription pills, and ten firearms, including handguns and long guns. Godfrey and Murray were then arrested and charged with state offenses.

Godfrey was soon released on bond, but he was later detained for failing to show for court proceedings and has since been in custody. Murray was released on bond and continued his illegal activities in the marijuana business, including purchasing marijuana from Everett. In June of 2018, the FPD knocked on the door of Murray's then-residence — his mother's home — on Back Street in Fayetteville. When Murray opened the door, the officers detected a marijuana odor. After obtaining a search warrant, the residence was searched and the officers seized multiple vacuum-sealed packages of marijuana, several firearms, and thousands of dollars in cash. Murray was interviewed and confessed to the FPD officers that his supplier — defendant Everett — was operating a major drug business from an apartment at the Addison Ridge complex in Fayetteville.

In about March 2018, Everett had moved to a new stash house — Apartment 5 of the Addison Ridge complex ("Addison Ridge #5"). Everett signed a lease in March 2018 for Addison Ridge #5, and the lease named his subsequent codefendant Alvin Davis as an authorized occupant.[2] Everett would be Davis's major drug supplier. While they were

---

[2] Codefendant Alvin Davis is not a party to this appeal. Davis pleaded guilty to the charges against him in the indictment, but did not testify against Everett. *See infra* n.6.

5

operating at that location, there were multiple complaints about marijuana odors associated with Addison Ridge #5, and Everett was seen carrying duffle bags to it. Everett owned a white Chevrolet Silverado that was often seen parked near Addison Ridge #5.

Armed with this information — including confirmation from Murray that his supplier Everett was based at Addison Ridge #5 — the FPD officers began surveilling there. During the FPD surveillance, they observed Davis exit Addison Ridge #5, enter a four-door Cadillac sedan, and leave the apartment complex. On July 16, 2018, the officers followed Davis's Cadillac and pulled him over for a window tint violation. Based on Davis's demeanor and related events, the FPD officers utilized a drug canine for an exterior sniff of the vehicle, and the canine alerted to the presence of controlled substances. In searching Davis's Cadillac the officers found two vacuum-sealed bags of marijuana, along with mason jars full of marijuana, cocaine hidden in a thermos bottle, a digital scale, and a loaded Smith & Wesson handgun, plus ammunition magazines. The officers then went to the front door of Addison Ridge #5, where the canine again alerted. As a result, the FPD officers — later that day — sought and obtained a state court search warrant for Addison Ridge #5.

In executing the Addison Ridge #5 search warrant on July 16, the FPD officers confirmed that it was a stash house. They found and seized in its master bedroom several vacuum-sealed bags of marijuana, a duffel bag with plastic bags matching those seized from Davis's Cadillac, plastic tubs containing marijuana residue, 346 grams of cocaine, and a safe. The safe contained several pound bags of marijuana, more than $5,500 in cash, and a loaded CZ Scorpion handgun, which was a firearm type that Everett was known to

6

possess.  On the dresser in the master bedroom, the FPD officers found and seized a receipt from a local car business, which bore Everett's name, along with a new address — 1080 Ronald Reagan Drive in Fayetteville (the "Reagan Residence," or the "Residence").  The officers immediately suspected that the Reagan Residence was Everett's home, and they soon corroborated their suspicions by confirming that the Fayetteville Public Works Commission listed the Residence as Everett's home.  Elsewhere in the search of Addison Ridge #5, the officers seized THC wax, additional drug packaging, digital scales, and a ledger memorializing drug transactions.

## B.

On July 17, 2018, primarily relying on the evidence and contraband discovered and seized from the Addison Ridge #5 stash house, the FPD officers obtained a state court arrest warrant for Everett.  Soon thereafter, the officers began to surveil the three-story Reagan Residence.  They promptly noticed a decent amount of foot traffic in and out of the Residence, which they ascertained was used as a licensed daycare center by Everett's wife — Victoria — called "Tori's Playhouse."  For the safety of children and parents, the officers delayed execution of the arrest warrant until about 7:30 p.m., hoping that the parents and children would not be present at the Residence.  During the intervening time period, the officers observed Everett's white truck parked in the backyard of the Residence and saw that Everett was at home.  They also saw Everett's wife arrive at the Residence during the afternoon, and observed that several security cameras surrounded it.

At about 7:30 p.m. two of the FPD detectives approached the Reagan Residence, knocked on the front door, and Everett answered.  The officers then entered the Residence

7

— with the arrest warrant — and arrested Everett in the front foyer area, near the kitchen.[3]
Everett's wife soon appeared and advised the officers that a friend — named Latasha —
was in a bathroom, that two children were upstairs, and that there was a dog in the
Residence. The officers then allowed Everett's wife to go upstairs and retrieve the children.

After conferring, the FPD officers and their supervisor decided to conduct a
protective sweep of the Reagan Residence. When passing a banister at the top of the stairs
on the second floor the officers observed a bottle of THC gummies. In a closet of the
master bedroom, two loaded rifles were seen on a shelf. The officers did not open any
containers or go through any drawers, and they limited themselves to looking for other
individuals in the rooms and closets. And they did not then seize the loaded firearms or
any contraband or evidence. Their protective sweep lasted approximately three-and-a-half
minutes.

Soon thereafter, the arresting FPD officers transported Everett to the Fayetteville
police station and courthouse and sought a search warrant for the Reagan Residence. Other
FPD officers remained at the Residence and secured the premises pending the search
warrant request. The affidavit for the warrant described the investigation as it then stood,
including the seizure of substantial quantities of illegal drugs, drug paraphernalia, and

---

[3] The parties contest where Everett's arrest actually took place. But even if his arrest
had occurred on the front porch, it would not help him. We have recognized that even
when an individual is "arrested outside the home [it] does not affect the protective sweep
analysis." *See United States v. Laudermilt*, 677 F.3d 605, 611 n.2 (4th Cir. 2012). In any
event, the district court credited the testimony of the officers that Everett's arrest was made
inside the front door. And we accept the facts in the light most favorable to the
Government. *See* n.1, *supra*.

8

paperwork bearing Everett's name that were seized at the Addison Ridge #5 stash house. The affidavit explained that an arrest warrant for Everett had been obtained and executed, described the officers' surveillance of the Residence, and advised that a "security sweep" had been made "[f]or the safety of everyone on scene." J.A. 179. A state court magistrate judge issued the search warrant, which commanded that it be executed.

Returning at approximately 9:00 p.m. to search the Residence as required by the warrant, the officers found and seized eight loaded firearms — including, inter alia, an AR-15 assault rifle, a SKS 7.62 rifle, a MG-G4 .223 rifle, and a PS90 rifle; at least $65,000 in cash; digital scales; drug packaging materials; and other containers that matched those found at Addison Ridge #5. In a backyard shed, the FPD officers found and seized a substance called tramadol (an opioid medication), THC wax, Tupperware containers with marijuana residue, vacuum sealers, and a Ziploc package from Colorado with a label stating that it contained THC. The Tupperware containers matched those seized at Addison Ridge #5. The officers also found and seized a handgun from the truck parked in the backyard.

During their search, the FPD officers also found a receipt for storage units in Latasha's name, along with two separate storage unit keys. Advised by Latasha that Everett had visited the storage units recently, the officers obtained another search warrant for the units and also searched them. In the storage units — located about a three-minute drive from the Residence — the officers found and seized containers and duffle bags with vacuum-sealed packages of marijuana. In total, they found and seized about 67 pounds of marijuana.

C.

After his arrest, Everett made several efforts to obstruct justice by threatening witnesses, and he also sought to continue his illegal drug operations. He tried to coordinate, from his jail cell, a shipment of marijuana and other illicit drugs from his marijuana suppliers.[4] For whatever reason, Everett was placed in the same jail as his coconspirator Murray. Murray had made statements to FPD investigators that incriminated Everett, and Everett sought to convince Murray to retract these statements. When Murray refused to retract — even after Everett had offered money — Everett told other inmates that Murray was cooperating with the prosecutors. As a result, Murray and his family were threatened with serious harm. Everett offered another inmate $500 to make a false affidavit to the effect that the inmate had heard a witness named Byrd confess that his inculpatory statements against Everett were fabricated. Everett asked this inmate to relay to others that a man named Wilson — who had also incriminated Everett — was a prosecution witness, thus jeopardizing Wilson's safety.

D.

On August 17, 2021, a federal grand jury in the Eastern District of North Carolina returned an eight-count superseding indictment against Everett and Davis. Everett was a named defendant in six counts — Count One and Counts Four through Eight. Those charges were the following:

---

[4] Everett also falsely claimed that the FPD officers had planted evidence against him, but an internal FPD investigation rejected those efforts.

- Conspiracy to possess with intent to distribute marijuana, THC, and cocaine, from 2016 to 2018, in violation of 21 U.S.C. § 841(a)(1) (Count One);

- Aiding and abetting the possession with intent to distribute a quantity of marijuana and a quantity of cocaine on July 16, 2018, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Four);

- Possession of a firearm on July 16, 2018, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five)

- Possession with intent to distribute a mixture and substance containing THC and a quantity of tramadol, on July 17, 2017, in violation of 21 U.S.C. § 841(a)(1) (Count Six);

- Possession of a firearm on July 17, 2018, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Seven); and

- Aiding and abetting the possession with intent to distribute a quantity of marijuana, on July 18, 2018, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Eight).

On November 30, 2020, Everett filed his motion to suppress, seeking to exclude the evidence seized pursuant to the search warrant, and maintaining that the warrant was unconstitutionally tainted by the FPD's protective sweep of the Reagan Residence. On March 4, 2021, the district court conducted a hearing on the suppression issues. Body-camera footage was introduced and played of the relevant events, and two of the FPD officers testified. After a recess, the district court orally denied Everett's motion to suppress. In so ruling, the court first found that each of the testifying officers was credible. The court also explained that the question being assessed concerned how a reasonably prudent officer would act in the circumstances presented. The court then reasoned that the FPD officers had probable cause to know at least the following when Everett was arrested:

11

> [T]hat the defendant was a large-scale drug trafficker, that the drug trafficking organization involved armed individuals, including the defendant; that there had been a seizure of a large amount of drugs and currency and firearms from Alvin Davis and at the apartment that . . . Davis and Everett shared in the days immediately preceding this, and that officers did not have eyes on inside the house.

J.A. 163. The court noted that the officers had already been surprised by the presence of an unexpected person in the Residence — that is, Latasha — and that "the officers certainly could draw a rational inference between the connection between a narcotics dealer . . . and firearms." J.A. 165. The court then ruled that the circumstances justified the protective sweep conducted of the Reagan Residence, explaining that:

> [The FPD officers] certainly had articulable facts, taken together with rational inference[s] that would warrant a reasonably prudent officer in believing that the area to be swept harbored an individual posing a danger to those on the arrest scene.

J.A. 163-64. The court also explained that the protective sweep of the Residence was limited in time and scope, and that it lasted no longer than necessary to dispel a reasonable belief of potential danger.[5]

---

[5] In the alternative, the district court ruled that, if the protective sweep was ruled unconstitutional, the evidence seized from the Reagan Residence was not tainted because it was obtained under the so-called "independent source exception" to the Fourth Amendment warrant requirements. And the court ruled that, if the independent source exception was not enough to cleanse the protective sweep, the evidence was not tainted because the FPD officers had acted in good faith in relying on the search warrant, thus satisfying the good faith exception to the Fourth Amendment requirements.

E.

In May 2022, Everett was tried before a jury in Raleigh, North Carolina.[6]  At the conclusion of his four-day trial, the jury found Everett guilty of all six charges levied against him.  On Count One, the jury found that the drug weights attributable to Everett for his role in the drug conspiracy were 1,000 kilograms or more of marijuana, "a quantity" of THC, and five kilograms or more of cocaine.[7]  According to Everett's presentence investigation report (the "PSR"), he had a criminal history score of 0 and a criminal history category of I.  His base offense level was 34.  This offense level was largely predicated on the district court's finding that Everett was responsible for 12,984.95 kilograms of converted drug weight.  Of that amount, 11,200 kilograms were based on the 56 kilograms of cocaine the PSR attributed to Everett because, under the Guidelines, there is a 1:200 conversion rate for cocaine.  *See* U.S.S.G. § 2D1.1.  Most of the remaining converted drug weight was made up of 1,711.81 kilograms of marijuana.  After applying enhancements, the PSR recommended a total offense level of 43.[8]

---

[6] Everett was tried twice, and this appeal is from the second trial.  His first trial, in December of 2021, resulted in a mistrial.  Prior to the first trial, Everett's codefendant, Davis, pleaded guilty to the charges against him in the indictment.  He apparently did not cooperate with the prosecutors, however, and was sentenced to 132 months in prison.

[7] Count One of the indictment alleged that the amount of illegal drugs involved in the conspiracy and attributable to Everett was 1,000 kilograms or more of marijuana, a quantity of THC, and five kilograms or more of cocaine.

[8] The four enhancements recommended in the PSR included (1) a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining premises for the purpose of manufacturing or distributing a controlled substance; (2) a four-level enhancement under U.S.S.G. § 3B1.1(a) for being an organizer or leader of criminal activity involving five or (Continued)

At his sentencing hearing on August 25, 2022, Everett's counsel maintained that the drug weight calculation of 12,984.95 kilograms was fatally flawed and prejudicial. He contended that the PSR improperly had attributed 56 kilograms of cocaine to Everett based solely on one of Murray's interviews with FPD officers. Murray said that Everett was selling five kilograms of cocaine per month from November 2016 to May 2017 (35 kilograms), and one kilogram of cocaine per week from March 2018 to July 2018 (21 kilograms). The FPD officer who interviewed Murray confirmed at the hearing that Murray had said exactly that.

Everett contested the district court's drug weight findings as contrary to the trial evidence. Murray had testified that he had seen Everett with a "few bricks" of cocaine (under the evidence, a "brick" is a kilogram) on a Facetime call; that Everett had received a kilogram of cocaine per week from his supplier — a man named Romeo in Texas — for an unspecified period of time; and that Everett had received "over five bricks" of cocaine. In sum, the FPD officers had seized less than one-half kilogram of cocaine at Addison Ridge #5, and no cocaine from the Reagan Residence or elsewhere. Finding Murray credible, and also finding that the statements made in Murray's debriefing by the FPD did

---

more people; (3) a two-level enhancement under U.S.S.G. § 2D1.1(b)(16)(D) for witness intimidation; and (4) a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. Application of these enhancements resulted in an offense level of 44. That offense level was reduced to 43 pursuant to Chapter 5, Part A, comment n.2 of the Guidelines ("An offense level of more than 43 is to be treated as an offense level of 43"). As explained *infra* n.8, one of the enhancements (number (3) above) was not accepted by the sentencing court.

14

not conflict with his trial testimony, the court overruled Everett's objection to the drug weight calculation.

With an offense level of 42 and a criminal history category of I, Everett's final Guidelines sentencing range was 360 months to life.[9] The district court's crediting of Murray's statements had a substantial impact on Everett's Guidelines range. And the Government concedes that, if the district court had sentenced Everett on the basis of the jury's drug quantity finding, his Guidelines sentencing range would have been 235 to 293 months.

In the sentencing proceedings of August 25, 2022, counsel for both parties presented evidence relating to the 18 U.S.C. § 3553(a) factors. The district court considered each of those factors, particularly the related conduct factor, which included obstruction of justice, threatening of witnesses, and operating a drug trafficking enterprise from a daycare facility. Everett was then sentenced to 480 months in prison, plus five years of supervised release. Everett has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[9] In the sentencing proceedings Everett also objected to other enhancements recommended in the PSR. The district court sustained one of Everett's objections, ruling that it would be improper to apply a witness intimidation enhancement and also an obstruction of justice enhancement. The court thus imposed the obstruction of justice enhancement only, reducing Everett's total offense level from 43 to 42.

15

II.

Everett appeals from the criminal judgment entered on August 25, 2022, challenging the denial of his suppression motion, the sufficiency of the evidence supporting three of his convictions (Counts Four, Five, and Six), and his sentence of 480 months. We will address and dispose of each of those contentions.

A.

It appears that Everett's primary contention on appeal is that the district court erred in denying his motion to suppress. As we know, legal conclusions underlying the denial of a motion to suppress are reviewed de novo, and a court's factual findings are reviewed for clear error. *See United States v. Kolsuz*, 890 F.3d 133, 141-42 (4th Cir. 2018). And in assessing a motion to suppress, "we view the evidence in the light most favorable to the prevailing party below." *See United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004). As observed earlier, that standard means that the evidence relating to this suppression issue is viewed by us in the light most favorable to the Government.

Everett's motion to suppress the evidence seized from his Reagan Residence is pursued on Fourth Amendment grounds. As the Supreme Court has explained, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *See Silverman v. United States*, 365 U.S. 505, 511 (1961). And warrantless searches of a residence "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *See Katz v. United States*, 389 U.S. 347, 357 (1967).

16

The parties agree that the Reagan Residence was subjected to a warrantless protective sweep by the FPD officers, and that soon thereafter it was the subject of a warranted search.[10] The protective sweep occurred after Everett was arrested on an arrest warrant, and the sweep constituted a three-and-a-half-minute walkthrough of the Residence. During the sweep, the officers observed, inter alia, THC gummies and firearms, and they promptly secured the Residence while the search warrant was obtained. Armed with the search warrant, they conducted a thorough search of the Residence and seized, inter alia, marijuana, tramadol, THC wax, eight loaded firearms, at least $65,000 in cash, and drug packaging materials. Everett has challenged the protective sweep as unconstitutional.

In denying the motion to suppress, the district court rested its ruling on the proposition that the protective sweep of the Reagan Residence was justified. Such a sweep can be justified when law officers have an interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *See Maryland v. Buie*, 494 U.S. 325, 333 (1990). Recognizing that a protective sweep is on an adversary's turf, this exception to the warrant mandate requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer

---

[10] Everett also argues in his appellate submissions that the FPD officers lacked probable cause to believe that the Reagan Residence was his home before entering to arrest him. But the FPD officers had ample probable cause to conclude that the Residence was Everett's home. Everett, his truck, and his wife were located at that address, and the utility company associated his name with that address.

17

in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

The protective sweep exception requires more than a generalized worry of danger. That is, "a lack of information cannot provide an articulable basis upon which to justify a protective sweep." *See United States v. Jones*, 667 F.3d 477, 484. Here, the Government maintains that the facts available to the FPD officers were sufficient to justify a reasonably prudent officer in believing that the Reagan Residence had a dangerous person present. Those facts, as found by the district court include, inter alia:

- Officers knew that Everett was involved in a large-scale drug-trafficking operation with multiple confederates who likely were armed;

- Officers had found a firearm at Addison Ridge #5, and thus had good reason to believe that the Residence might contain firearms;

- Officers saw that surveillance cameras covered the exterior of the Residence, which reasonably suggested that those inside could be watching the officers; and

- When the officers entered the Residence, they were surprised by the presence of an unexpected person, which supported the proposition that other unknown persons could be there.

Again, a protective sweep of a residence is permissible when the facts "warrant a *reasonably prudent officer* in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *See Buie*, 494 U.S. at 334 (emphasis added). In this situation, the FPD officers knew that Everett was involved in an extended multi-party and multi-drug enterprise. The FPD had been "climbing the ladder" and were up to Everett. When Everett's compatriots were arrested, firearms were either found on their

18

person or seized nearby. It is important that the courts have consistently recognized the "general knowledge that guns are common in drug transactions," and that "entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers." *See United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994); *see also United States v. Manigan*, 592 F.3d 621, 629 (4th Cir. 2010) (recognizing that there is a "settled connection between firearms and drug activities"); *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976) (recognizing that "substantial dealers in narcotics keep firearms on their premises as tools of the trade"). The circumstances presented at the Reagan Residence on July 17, 2018 — including that Everett was clearly a high-level drug dealer — made the protective sweep a very prudent step by law enforcement.

The general knowledge that drugs and firearms are commonly paired was bolstered in this situation by the search of Addison Ridge #5, conducted a day earlier, where FPD officers had seized a CZ Scorpion in a room containing business papers bearing Everett's name. It was thus reasonable and prudent for the officers to believe that Everett would possess additional firearms in his Residence. And the presence of additional firearms in the Residence would pose a safety risk to the arresting officers because Everett was known to be acting illegally with others, and was himself at the pinnacle of a large drug enterprise. We have heretofore emphasized our concern for officer safety in situations involving firearms and drugs. *See United States v. Watson*, 703 F.3d 684, 693 (4th Cir. 2013) ("With respect to officer safety, we observe that the protection of police officers is of particular concern in cases in which both drugs and firearms are the subject of a pending search warrant.").

19

Pointing to the presence of surveillance cameras, the prosecution contends that their presence outside the Residence shows that the FPD officers would be monitored by potential third-party threats. Security cameras, of course, are not illegal and are a helpful prophylactic tool to protect a home. In these circumstances, however, the use of surveillance cameras at the home of a drug dealer like Everett, who was at the top of his drug distribution scheme, could reasonably support a protective sweep. When the FPD officers entered the Reagan Residence to arrest Everett, they immediately found an unexpected third person. Although some courts have indicated that the surprise of an additional person is not alone sufficient to justify a protective sweep, *see e.g.*, *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996); *United States v. Ford*, 56 F.3d 265, 269 n.6 (D.C. Cir. 1995), the circumstances at the Residence before the protective sweep were much more than just an additional person.

The officers knew, for example, they were about to arrest a substantial drug supplier, and he had a known connection to firearms and a network of drug distributors and compatriots. Taken together with the security cameras and the presence of the surprise occupant — as the district court recognized — the circumstances justified a reasonably prudent officer in conducting a protective sweep of the Residence to ensure the safety of himself and others.[11] Notably, the officers had ample probable cause and could readily

---

[11] The parties dispute whether the protective sweep lasted longer than "necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *See Buie*, 494 U.S. at 336. Put simply, however, the protective sweep lasted for only three-and-a-half minutes. The FPD officers engaged in a cursory inspection, looking only in locations where a human being might be (Continued)

have secured a search warrant for the Reagan Residence earlier, when they obtained the arrest warrant for Everett. But to deprive the officers of the right to conduct a protective sweep, in the circumstances existing at the Residence on the evening of July 17, 2018, would undermine officer safety.[12] This appellate contention of Everett's will therefore be rejected.

B.

Everett next argues that the prosecution failed to introduce sufficient trial evidence to convict him on Counts Four, Five, and Six — that is, aiding and abetting possession with intent to distribute marijuana and cocaine (Count Four), possession of a firearm in furtherance of a drug trafficking crime (Count Five), and possession with intent to distribute THC and tramadol (Count Six). For whatever reason, however, Everett's trial counsel failed to move in a timely manner for judgments of acquittal, which means that we review these sufficiency contentions for plain error only. *See United States v. Wallace*, 515 F.3d 327, 331 (4th Cir. 2008). To demonstrate plain error, a defendant must show that: (1) there was an error; (2) the error was clear or obvious; and (3) the error affected his "substantial rights." *See United States v. Olano*, 507 U.S. 725, 732-34 (1993).

---

hiding. In a light most favorable to the Government, the officers took no longer than necessary to secure their safety.

[12] Because we find no flaw in the district court's ruling that the FPD proceeded properly under the protective sweep exception, we need not address the court's alternative reasoning sanctioning the protective sweep under the independent source doctrine or the good faith exception.

A jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *See Glasser v. United States*, 315 U.S. 60, 80 (1942); *see also United States v. Martin*, 523 F.3d 281, 284 (4th Cir. 2008). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *See United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

1.

Count Four charged that Everett, on July 16, 2018, aided and abetted the possession of marijuana and cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. To prove aiding and abetting, the prosecution must establish that the defendant "(1) took an affirmative act in furtherance of the underlying offense and (2) did so with the intent of facilitating the offense's commission." *See United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023). Everett argues that the prosecution failed to prove that he was linked to his codefendant Davis, that he was party to Davis's drug distribution activities, or that he was connected to Addison Ridge #5. That contention, in the context of the trial evidence, defies reality. The evidence established that Everett leased Addison Ridge #5 — when he lived at another residence with his wife and children — and actually listed Davis as an Addison Ridge #5 "occupant." Everett's truck was regularly seen at Addison Ridge #5, and Everett was seen carrying duffel bags into Addison Ridge #5. There were also reports of marijuana odors emanating from the apartment. The evidence confirmed that Everett was a very substantial drug dealer, and Addison Ridge #5 was proven to be his "stash house." On this record, the jury was entitled to conclude that, as

22

charged, Everett knowingly associated himself with Davis and took affirmative steps to facilitate the distribution of illegal drugs.

2.

Everett also maintains that the prosecution did not sufficiently prove Count Five, which charged him with possession of a firearm on July 16, 2018, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Everett argues that there was insufficient evidence to show that he had constructive possession of the CZ Scorpion firearm found and seized at Addison Ridge #5. Everett contends that his joint tenancy at Addison Ridge #5 — with Davis — was not enough to establish his possession of the illegal drugs and the CZ Scorpion firearm. *See United States v. Morrison*, 991 F.2d 112, 115 (4th Cir. 1993). But the evidence showed much more than a joint tenancy. Drug distribution — especially in high volumes — goes together with firearms. Illegal drugs were found and seized in Addison Ridge #5, and the CZ Scorpion firearm was seized in the bedroom there, where a paper bearing Everett's name was also found. A reasonable jury could readily infer that the firearm — uniquely associated with Everett — was in fact Everett's personal weapon.

3.

Count Six alleged that Everett, on July 17, 2018, possessed, with intent to distribute, a substance containing THC and a quantity of tramadol, in violation of 21 U.S.C. § 841(a)(1). Everett argues that the prosecution failed to prove that the amount of tramadol and THC wax he possessed was more than what would be needed for personal use — thus negating a finding that Everett intended to distribute those substances. Godfrey, however,

23

confessed that he had purchased THC wax from Everett on several occasions. And the FPD found and seized THC wax at Addison Ridge #5. Everett's distribution of THC wax is consistent with other trial evidence, including that Everett was the leader of the large-scale drug enterprise and that Everett sold "practically . . . anything." *See* J.A. 669. Importantly, the THC wax and tramadol were found in the shed behind the Reagan Residence, where drug packaging materials, like those at Addison Ridge #5, were also seized. In these circumstances, it was reasonable for the jury to conclude that a large-scale drug dealer like Everett, in possession of THC wax and tramadol, intended to distribute them. We therefore reject Everett's claims of error as to the sufficiency of the evidence on Counts Four, Five, and Six.

## C.

Turning finally to the sentencing issues, Everett first challenges his sentence as procedurally unreasonable. More specifically, he argues that the sentencing court erred when it "based its Guidelines determination on a drug weight calculation supported only by information that [Murray] provided in a debriefing interview." *See* Br. of Appellant at 52.

It is well settled that "[w]e review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error." *See United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). And a reviewing court is only entitled to reverse such a conclusion when it is "left with the definite and firm conviction that a mistake has been committed." *See United States v. Stevenson*, 396 F.3d 538, 542 (4th Cir. 2005). We thus "afford great deference to a district judge's credibility determinations and

24

how the court may choose to weigh the evidence." *See United States v. Williamson*, 953 F.3d 264, 273 (4th Cir. 2020). At sentencing, the Government is obliged to establish drug quantity by a preponderance of the evidence. *See United States v. Milam*, 443 F.3d 382, 386 (4th Cir. 2006).

Everett maintains that the foregoing standard is not satisfied here, because the district court relied on Murray's statements to the FPD officers in a debriefing interview, and they conflict with Murray's trial testimony and the drug quantities actually seized during the investigation. In his debriefing interview, Murray asserted that Everett had sold five kilograms of cocaine per month from November 2016 to May 2017 (35 kilograms), and a single kilogram of cocaine per week from March 2018 to July 2018 (21 kilograms), for a total of 56 kilograms. At trial, however, Murray testified that he had seen Everett with a "few bricks" of cocaine on a Facetime call; Everett had received about a kilogram of cocaine per week from his supplier, a man named Romeo, for an unstated period; and that Everett had received at least "five bricks" of cocaine. Additionally, the FPD officers had seized less than one-half kilogram of cocaine at Addison Ridge #5, and they did not find or seize any cocaine at the Reagan Residence. Thus, Everett argues, only 5.5 kilograms of cocaine should be attributed to him.

For starters, there is "no requirement that the government present its relevant conduct evidence at trial, nor is the district court at sentencing bound by the evidence presented at trial when determining drug quantity or other relevant conduct." *See United States v. Young*, 609 F.3d 348, 358 (4th Cir. 2010). And in this situation, the district court

25

explicitly found that Murray was credible.[13]  At trial, Murray testified that Everett was regularly purchasing one kilogram of cocaine per week from his supplier.  And Murray dealt with Everett from approximately December 2016 to March 2018 (about 65 weeks). A fair inference from that evidence is that Everett had purchased about 65 kilograms.

Although the Government may have arrived at its 56-kilogram figure somewhat obliquely, it has nevertheless satisfied the applicable standard of proof, which is a preponderance of the evidence.  Although the record may support a larger amount (65 kilograms) or a smaller amount (5.5 kilograms), the evidence does not foreclose that Everett received 56 kilograms.  As a result, we are not left with "the definite and firm conviction that a mistake has been committed," and we see no procedural sentencing error. *See Stevenson*, 396 F.3d at 542.

### D.

Lastly, Everett challenges his 480-month sentence as substantively unreasonable. Otherwise stated, he argues that his sentence is greater than necessary to reflect the seriousness of his offenses, to promote respect for the law, and to provide for just punishment.

A reviewing court evaluates the substantive reasonableness of a sentence for abuse of discretion.  *See Gall v. United States*, 552 U.S. 38, 51 (2007).  And "[a] district court

---

[13] Everett also argues that Murray's statements about drug quantity should have been discarded because they are accomplice testimony.  We have long recognized that accomplice testimony alone, if believed, "is sufficient to sustain a conviction." *See United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976) (per curiam).  Put simply, accomplice testimony is also sufficient to sustain a drug quantity finding for sentencing purposes.

abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *See United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012). A sentence that falls within the advisory Guidelines range — like the one challenged here — is deemed "presumptively reasonable." *See United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022). We have ruled that "a defendant can only rebut the presumption by demonstrating that the sentence is unreasonable when measured against the § 3553(a) factors." *See United States v. Montes-Pineda*, 445 F.3d 375, 379 (4th Cir. 2006).

Section 3553(a) of Title 18 provides, in relevant part, that the district court should impose a sentence that will:

(A)   reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense;

(B)   afford adequate deterrence to criminal conduct;

(C)   protect the public from further crimes of the defendant; and

(D)   provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C § 3553(a)(2). In challenging the lengthy sentence imposed on him, Everett maintains that the district court failed to properly consider those factors.

First, Everett argues that he had no prior criminal history, and maintains that a lesser sentence could promote respect for the law. The district court emphasized, however, that his aggravating conduct between 2016 and his 2022 sentencing — including Everett's

27

efforts to deal drugs from jail, obstruct justice and intimidate witnesses, perjure himself,[14] and make false claims that the FPD officers had planted evidence — established the need for a longer prison term.

Second, Everett argues that his 480-month sentence overstates the seriousness of his offenses. But a large portion of his prison sentence accounts for the most important sentencing fact — Everett was a drug kingpin who moved an exceptionally high volume of drugs in less than two years, including nearly two tons of marijuana. Furthermore, Everett partially stored his drugs in his Reagan Residence and armed himself heavily within his own home, which was also being operated as a daycare center. The district court deemed it particularly serious that Everett would compromise the safety of children with the presence of multiple firearms and drugs, along with the attendant risks of operating a major illegal drug operation.

More specifically, Everett argues that a sentence of 240 months would have been sufficient, and would deter even those who engage in murder, sexual abuse, and kidnapping. Perhaps, but Everett was charged with an extended multi-drug and multi-participant drug trafficking enterprise, which moved a high volume of illicit substances. Here, however, we cannot say that the district court abused its discretion in arriving at its Guidelines sentence.

---

[14] During Everett's first trial, *supra* n.6, he testified on his own behalf, and the district court deemed his testimony perjurious. And the court thus considered his perjurious testimony against Everett at sentencing.

Everett argues that his history of lawful employment, combined with his age, makes him an unlikely candidate for recidivism. Indeed, Everett is in his mid-thirties and may not complete his sentence until his mid-seventies. But the likelihood of recidivism was only one factor considered by the district court, and the court emphasized the length and seriousness of Everett's criminal enterprise, coupled with his corrupt efforts to obstruct justice, to show that Everett was prone to future conduct that would harm and undermine the public interest absent a substantial sentence. In these circumstances, we are constrained to reject Everett's contention that his sentence is substantially unreasonable.

## III.

Pursuant to the foregoing, we reject each of the appellate contentions pursued by Everett and affirm the judgment of the district court.

*AFFIRMED*

29